1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BURSOR & FISHER, P.A.**
Sean L. Litteral (State Bar No. 331985)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: slitteral@bursor.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice* forthcoming)
Alec M. Leslie (*pro hac vice* forthcoming)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jarisohn@bursor.com
        aleslie@bursor.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| MAHMOOD DAWOOD, on behalf of himself and all others similarly situated,<br><br>                                Plaintiff,<br><br>        v.<br><br>GAMER ADVANTAGE LLC,<br><br>                                Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Mahmood Dawood ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Gamer Advantage LLC ("Defendant").  Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      Plaintiff brings this class action lawsuit on behalf of himself and similarly situated consumers ("Class Members") who purchased for personal, family or household use Defendant's FogAway Anti-Fog Spray (the "Product"), which is unfit for its intended use because it contains unsafe per- and polyfluoroalkyl substances ("PFAS").  The Product is formulated, designed, manufactured, advertised, distributed, and sold by Defendant or its agents to consumers, including Plaintiff, across the United States, including in California.

2.      PFAS are a group of synthetic chemicals known to be harmful to both the environment and humans.  Because PFAS persist and accumulate over time, they are harmful even at very low levels.  Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxic effects, and various cancers in epidemiology studies."[1]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health and how the risks may be underestimated.  Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[2]

4.      Relevantly, despite Defendant's representations to consumers that its products are "Safe For Use," including on its website, Product packaging, and directly on the Product (as shown below), independent research conducted at the Nicholas School of Environment at Duke University

[1] Nicholas J. Herkert, et. al., "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," *Environ. Sci. Technol.* 2022, 56, 1162-1173, 1162.
[2] Harvard T.H. Chan Sch. Of Pub. Health, *Health risks of widely used chemicals may be underestimated* (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-health-risks-underestimated/ (last viewed Mar. 22, 2022).

determined that "the products were much more toxic than any of the individual [PFAS] chemicals in the sprays."[3]  That is, not only are the individual chemicals used to make the Product harmful, but, in turn, the Products—akin to a toxic cocktail—are harmful and should be avoided.



5.      In particular, the researchers determined that "[o]f the four anti-fog sprays, spray A [the Product] had the highest [total organic fluorine] of **20,700 micrograms per milliliter** μg/mL" as compared to the other sprays which tests at "221, 202, and 190 μg/mL, respectively."[4] Accordingly, a single spray of the Products would expose a consumer to PFAS at levels that are several orders of magnitude higher than one would receive from drinking a liter of water that contains PFAS at the current EPA health advisory limit for safe consumption, which is just **70 nanograms per liter**.[5]  To put this in context, 1 microgram is the equivalent of 1000 nanograms.  Accordingly,

---

[3] *See supra* n. 1, at 1168.
[4] *Id*. at 1167.
[5] Duke University, Nicholas School of the Environment, "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," Jan. 5, 2022, https://nicholas.duke.edu/news/high-levels-pfas-found-anti-fogging-sprays-and-cloths (last accessed Mar. 22, 2022).

20,700 micrograms is the equivalent of 20,700,000 nanograms. This means that the Product exposes consumers to a level approximately 295,714 times that which is considered safe by the EPA.

6.      This is particularly worrisome in the context of Defendant's marketing, which shows the spray being deployed directly on the glasses while they are still being worn. Research shows that exposure near the eyes and mouth increases the likelihood and hence risk of absorption and ingestion.[6]

 

7.      Based on Defendant's representations, a reasonable consumer would expect that the Products can be safely used as marketed and sold. However, the Products are not safe, posing a significant health risk to unsuspecting consumers. Yet, neither before or at the time of purchase does Defendant notify consumers like Plaintiff that their Products are unsafe, contain heightened levels of PFAS, or should otherwise be used with caution.

8.      Accordingly, Plaintiff brings his claims against Defendant individually and on behalf of a class of all others similarly situated for (1) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (2) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (3) breach of Implied Warranty under Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1792, *et seq*. and California Commercial Code § 2314; (4) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (5) Fraud; (6)

---

[6] Heather D. Whitehead et al., "Fluorinated Compounds in North American Cosmetics," *Env't Sci & Tech*. 2021, 8, 7, 538-44 (June 15, 2021), https://pubs.acs.org/doi/10.1021/acs.estlett.1c00240 (last accessed Mar. 22, 2022).

Constructive Fraud; (7) Fraudulent Inducement; (8) Money Had and Received; (9) Fraudulent Omission or Concealment; (10) Fraudulent Misrepresentation; (11) Negligent Misrepresentation; (12) Quasi-Contract / Unjust Enrichment; (13) Breach of Express Warranty; (14) violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*; and (15) Negligent Failure to Warn.

## PARTIES

9.      Plaintiff Mahmood Dawood is a natural person and a citizen of California who resides in Lodi, California.  In approximately the summer of 2021, Mr. Dawood purchased Defendant's Product from a Walmart retail store located in Lodi.  Prior to his purchase, Mr. Dawood reviewed the labeling, packaging, and marketing materials of his Product, including those set out in the foregoing and those to follow, and saw the false and misleading claims that the Products are Safe for Use.  Mr. Dawood understood these claims to be representations and warranties by Defendant that the Products are in fact safe for use.  Mr. Dawood reasonably relied on these representations and warranties in deciding to purchase the Product, and these representations were part of the basis of the bargain in that he would not have purchased the Products, or would not have purchased them on the same terms, if the true facts had been known.  As a direct result of Defendant's material misrepresentations and omissions, Mr. Dawood suffered and continues to suffer, economic injuries. Nonetheless, Mr. Dawood remains very much interested in purchasing from Defendant in the future and hopes he can rely on Defendant's marketing when doing so.

10.      Defendant Gamer Advantage LLC is a foreign corporation with its principal place of business located in Walled Lake, Michigan.  Defendant describes itself as "committed to the wellness of every gamer" and as "on a mission to create products that genuinely improve the well-being of all gamers."[7]

## JURISDICTION AND VENUE

11.      This Court has subject matter jurisdiction pursuant to U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of costs and interest, and Plaintiff, as well as most members of

---

[7] Gamer Advantage, "Our Mission," https://gameradvantage.com/pages/mission-1 (last visited Mar. 22, 2022).

the proposed class, are citizens of states different from Defendant.  This Court also have supplemental jurisdiction over state law claims pursuant to 28 U.S.C § 1367.

12.     This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within California such that Defendant has significant, continuous, and pervasive contacts with the State of California.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District, as Plaintiff purchased the Product in this District and is a citizen and resident of this District.

## FACTUAL ALLEGATIONS

### A.     Anti-Fog Remedies & Consumer Preferences

14.     According to the Vision Council, a nonprofit trade association for optical manufacturers and suppliers, a projected 164 million American adults wear glasses.[8]  With the onset of the COVID-19 pandemic, "glasses fogging" has become "more common due to the ubiquitous use of face masks."[9]

15.     In turn, consumers, such as those interviewed by WebMD on this topic, have reported that glasses fogging has "affect[ed] [their] overall quality of life."[10]  Consumers experience the frustration of wearing their mask while trying to keep their vision clear from the fog that naturally envelops their lenses.

16.     For this reason, several companies, including Defendant, have expanded their marketing efforts to attract consumers into purchasing anti-fog remedies.  As the referenced WebMD

[8] Allison Collins, "Why people wear glasses may surprise you," *All About Vision* (Feb. 2020), https://www.allaboutvision.com/eyeglasses/faq/why-people-wear-glasses/#:~:text=A%20projected%20164%20million%20American,according%20to%20a%202016%20study (last visited Mar. 22, 2022).
[9] John F. Dankert, et al. "Mask-Related Glasses Fogging: A Predisposing Mechanism of Falls during the COVID-19 Pandemic," *Case Reports in Orthopedics* (Aug. 10, 2021), https://www.hindawi.com/journals/crior/2021/5600216/ (last visited Mar. 22, 2022).
[10] Sandra Young, "Face Masks and Foggy Glasses: A COVID Consequence," WebMD (Oct. 20, 2020), https://www.webmd.com/lung/news/20201020/face-masks-and-foggy-glasses-a-covid-conundrum (last accessed Mar. 22, 2022).

articles notes, "[t]he internet is [now] full of ads touting anti-fog sprays, cloths, creams, and wipes."[11] Faced with limited options, consumers have also taken to solutions such as "applying dish soap, hand sanitizer, iodophor (iodine complexed with a solubilizing agent)[.]"[12]  Thus, this void represents a significant business opportunity for companies like Defendant.

17.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "[w]hen asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[13] Significantly, "[t]hese factors won out over convenience, country of origin, environmental impact, product performance, price and social / human rights / labor impact."[14]

18.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more and 17% willing to spend 1-5% more."[15]

19.     Thus, there is enormous incentive for companies such as Defendant to market their anti-fog products as safe.  Indeed, at every possible opportunity, Defendant represents the safety of the Product, including on its website, packaging, and directly on the Product themselves.  Examples of these representations are included below.

///

///

///

///

///

///

///

---

[11] *Id.*
[12] Herkert, et. al., *Environ. Sci. Technol.* at 1162.
[13] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wp-content/uploads/2017/07/What-Shoppers-Want.pdf (last visited Mar. 22, 2022).
[14] *Id.* at 3.
[15] *Id.*

1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17
18
19
20





21
22
23
24
25   ///
26   ///
27   ///
28

1
2
3
4
5
6
7
8
9
10
11
12
13



14   20.    Prior to his purchase, Plaintiff saw these and like representations, and believed that

15   the Products were safe for use.  As a result, Plaintiff relied on these and like representations in

16   purchasing the Product.  However, as described in the next section, Defendant's Product is not safe

17   for use, and poses a critical risk to the safety and health of consumers.

18        **B.    Defendant's Anti-Fog Spray Is Toxic**

19        21.    The results of the study performed at Duke University are set out in the table below.[16]

20   Spray A is the Product at issue.

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27

28

---

[16] Herkert, et. al., *Environ. Sci. Technol*. at 1163.

CLASS ACTION COMPLAINT                                                                    8

| | Concentration ($\mu g$/mL) | | | |
| --- | --- | --- | --- | --- |
| | Spray A | Spray B | Spray C | Spray D |
| 6:2FTOH | 10,600 | 25.8 | 3.46 | 3.43 |
| 8:2FTOH | - | - | - | - |
| 10:2FTOH | - | - | - | - |
| 6:2FTEO1[b] | N.Q. | N.Q. | N.Q. | N.Q. |
| 6:2FTEO2 | 35.2 | 1.08 | 0.193 | 0.194 |
| 6:2FTEO3 | 129 | 2.55 | 0.8 | 0.804 |
| 6:2FTEO4 | 1010 | 16.2 | 8.84 | 8.89 |
| 6:2FTEO5 | 2670 | 42.8 | 33 | 32.1 |
| 6:2FTEO6 | 2790 | 50.1 | 52.9 | 51.4 |
| 6:2FTEO7 | 2200 | 46.8 | 64.6 | 63 |
| 6:2FTEO8 | 1720 | 44.3 | 73.4 | 75.9 |
| 6:2FTEO9 | 1280 | 35.4 | 76 | 78.3 |
| 6:2FTEO10 | 964 | 28 | 77.6 | 79.7 |
| 6:2FTEO11 | 616 | 17.2 | 67.3 | 66 |
| 6:2FTEO12 | 429 | 9.53 | 39.8 | 49.2 |
| 6:2FTEO13 | 517 | 7.19 | 31.1 | 57.1 |
| $\sum$ionic PFAS[c] | 1.37 | 0.062 | 0.019 | 0.037 |
| $\sum$PFAS | 25,000 | 327 | 529 | 566 |
| TOF measurement | 20,700 (508) | 221 (3) | 202 (2) | 190 (1) |
| % TOF explained by FTEOs and FTOHs | 60% | 57% | 88% | 99% |

22.     As demonstrated, the Product contains significantly more PFAS than its competitors. This shows that it is possible for Defendant to develop its anti-fog solutions without the heightened level of PFAS inherent in its current chemical composition.  Yet, Defendant chose not to, and instead concealed this information.

23.     That decision has drastic consequences for consumers.  One of the PFAS types, called fluorotelomer alcohols ("FTOHs"), "are of particular concern in the indoor environment where they are released from commercial products and are frequently a dominant class of PFAS detected in dust and indoor air."[17]

---

[17] *Id.* at 1167.

24.     The researchers noted that "[p]revious studies have shown that FTOHs and other precursor compounds can transform to more toxic and stable ionic [perfluorooctanoic acid] PFAAs via aerobic[18] and metabolic[19] pathways."  Importantly, PFAAs are an umbrella consisting of such toxins as "perfluorooctanoic acid (PFOA) and perfluorooctanoic sulfonic acid (PFOS), which are known to be more toxic that many other studied PFAS."[20]

25.     Simply said, the PFAS detected in the Product may—through natural and inevitable processes such as exposure to the air—transform into disconcerting chemicals known to increase risk of kidney cancer, testicular cancer, ovarian and endometrial cancer, prostate cancer, non-Hodgkin lymphoma and thyroid cancer.[21]

26.     These risks are heightened "in the indoor environment as FTOHs measured in indoor air have been found to be significantly correlated with serum PFAAs, suggesting that metabolic transformations are occurring in the body and that exposure to FTOHs may be a source of exposure to the more toxic substances."[22]

27.     The researchers further noted that "research suggests that once FTOHs have been inhaled or absorbed through the skin, they could break down in the body to PFOA or other long-lived PFAS substances that are known to be toxic."[23]

28.     But that is not the only cause for concern.  As the chart above reveals, the Product also tests for fluorotelomer ethoxylates (FTEOs).  These "have been shown to induce adipogenesis *in vitro*, implicating them as potential endocrine disruptors."[24]  In other words, these substances "can

---

[18] "Aerobic" refers to activity that occurs as a response to oxygen.  *See* "aerobic."  Merriam-Webster.com. 2022, https://www.merriam-webster.com/dictionary/aerobic (last accessed Mar. 22, 2022).

[19] "Metabolic pathways" refers to "a set of actions or interactions between genes and their products that results in the formation or change of some component of the system."  *See* "Metabolic Pathway," *Science Direct*, https://www.sciencedirect.com/topics/biochemistry-genetics-and-molecular-biology/metabolic-pathway (last accessed Mar. 22, 2022).

[20] Herkert, et. al., *Environ. Sci. Technol*. at 1162.

[21] National Cancer Institute Division of Cancer Epidemiology & Genetics, "PFAS Exposure and Risk of Cancer," https://dceg.cancer.gov/research/what-we-study/pfas (last accessed Mar. 22, 2022).

[22] Herkert, et. al., *Environ. Sci. Technol*. at 1162.

[23] Duke Nicholas School of the Environment, "High Levels of PFAS Found in Anti-Fogging Sprays and Cloths," (Jan. 5, 2022), https://nicholas.duke.edu/news/high-levels-pfas-found-anti-fogging-sprays-and-cloths (last accessed Mar. 22, 2022).

[24] Herkert, et. al., *Environ. Sci. Technol*. at 1163.

alter the body's sensitive systems and lead to health problems."[25]

29.     That these substances are harmful to the human body is beyond dispute.  In a 2019 study, for example, the U.S. Department of Health and Human Services' National Toxicology Program found that PFAS have adverse effects on human organ systems, with the greatest impact seen in the liver and thyroid hormone.[26]

30.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:"[27]



31.     The Center for Disease Control's Agency for Toxic Substances and Disease Registry has also recognized that exposure to high levels of PFAS may impact the immune system and reduce

[25] National Institute of Environmental Sciences, "Endocrine Disruptors," https://www.niehs.nih.gov/health/topics/agents/endocrine/index.cfm (last accessed Mar. 22, 2022).
[26] Environmental Protection Agency, PFAS Explained, https://www.epa.gov/pfas/pfas-explained (last accessed Mar. 22, 2022).
[27] European Environment Agency, "Emerging Chemical Risks in Europe – 'PFAS'" (Dec. 12, 2019), https://www.eea.europa.eu/publications/emerging-chemicals-risks-in-europe (last accessed Mar. 22, 2022).

antibody responses to vaccines.[28]

32.     In total, this research demonstrates that the risk of severe health complications arising from exposure to PFAS is both credible and substantial.

**C.      Defendant's Misrepresentations and Omissions Are Actionable**

33.     Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are marketed as "Safe For Use," when they are not in fact safe for use.

34.     Plaintiff and Class Members bargained for antifog products that are safe for use, and were deprived of the basis of their bargain when Defendant sold them a product containing dangerous substances with well-known health consequences.

35.     No reasonable consumer would expect that a product marketed as "Safe For Use" would pose a risk to their health, safety, and wellbeing, or that it would contain dangerous PFAS, which are indisputably linked to harmful health effects in humans.  Accordingly, Plaintiff and Class Members suffered economic injuries as a result of purchasing the Products.

36.      As the Products expose consumers to PFAS that pose a risk to consumers' health, the Products are not fit for use by humans.  Plaintiff and the Class are further entitled to damages for the injury sustained in being exposed to high levels of toxic PFAS, damages related to Defendant's conduct, and injunctive relief.

37.     Moreover, because these facts relate to a critical safety-related deficiency in the Product, Defendant was under a continuous duty to disclose to Plaintiff and Class members the true standard, quality, and grade of the Products and to disclose that the Products contained substances known to have adverse health effects.   Nonetheless, Defendant concealed and affirmatively misrepresented the Product, as discussed herein.

38.     Although Defendant is in the best position to know what content it placed on its website and in marketing materials during the relevant timeframe, and the knowledge that

---

[28] Agency for Toxic Substances and Disease Registry, "What are the health effects of PFAS" https://www.atsdr.cdc.gov/pfas/health-effects/index.html (June 24, 2020) (last accessed Mar. 22, 2022).

Defendants had regarding the PFAS and their failure to disclose the existence of PFAS in the Products to consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

39.     WHO:  Defendant made material misrepresentations and/or omissions of fact about the Products through their labeling, website representations, and marketing statements, which include the statement that the Products are "Safe For Use."  These representations constitute omitted material information regarding harmful chemicals in the Products.

40.     WHAT:  Defendant's conduct here was, and continues to be, fraudulent because it omitted and concealed that the Products contain substances—PFAS—that are widely known to have significant health repercussions.  Thus, Defendant's conduct deceived Plaintiff and Class Members into believing that the Products are safe, when they are not.  Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet they continued to pervasively market the Products in this manner.

41.     WHEN:  Defendant made material misrepresentations and/or omissions during the putative Class periods, including prior to and at the time Plaintiff and Class Members purchased the Products, despite its knowledge that the Products contained harmful substances.

42.     WHERE:  Defendant's marketing message was uniform and pervasive, carried through material misrepresentations and/or omissions on the labeling of the Product's packaging, website, and through marketing materials.

43.     HOW:  Defendant made material misrepresentations and/or failed to disclose material facts regarding the Products, including the presence of PFAS.

44.     WHY:  Defendant made the material misrepresentations and/or omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Product, the effect of which was that Defendant profited by selling the Products to tens of thousands of consumers.

45.     INJURY:  Plaintiff and Class Members purchased, paid a premium, or otherwise paid

more for the Products when they otherwise would not have absent Defendant's misrepresentations and/or omissions.

**D.      Tolling And Estoppel Of The Statute Of Limitations**

46.      Defendant has had actual knowledge for years that the Product contains harmful chemicals such as PFAS.

47.      Although Defendant was aware of the deception in its labeling given the inclusion of PFAS in the Products despite claims of the Products safety, it took no steps to warn Plaintiff or Class Members of risks related to PFAS in the Products.

48.      Despite its knowledge, Defendant has fraudulently misrepresented the risks of the Product.  Defendant had a duty to disclose the true nature and quality of the Product and to disclose the health and safety risks associated with the Product.

49.      Defendant made, and continues to make, affirmative misrepresentations to consumers, to promote sales of the Product, including that the Product is "Safe For Use."

50.      Defendant concealed material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Product.  Defendant's concealment was knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendant's concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

51.      The PFAS included in the formulation, design and/or manufacture of the Products was not reasonably detectible to Plaintiff and Class Members.

52.      At all times, Defendant actively and intentionally concealed the existence of the PFAS and failed to inform Plaintiff or Class Members of the existence of the PFAS.  Accordingly, Plaintiff and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

53.      Defendant's statements, words, and acts were made for the purpose of suppressing the truth that the Products contained harmful chemicals.

54.      Defendant concealed or misrepresented the PFAS for the purpose of delaying Plaintiff

and Class Members from filing a complaint on their causes of action.

55.      As a result of Defendant's active concealment of the PFAS and/or failure to inform Plaintiff and Class Members of the PFAS, any and all applicable statute of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendant is estopped from relying on any statute of limitations in light of its active concealment of the potentially harmful nature of the Product.

56.      Further, the causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that the Products contained PFAS which, at the very earliest, would have been January 2022, following the study at Duke University.  Plaintiff and Class Members had no realistic ability to discern that the Products contained PFAS until after the study.  Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendant's active concealment of the existence of PFAS in the Product and of the Product's true nature.

## CLASS ALLEGATIONS

57.      Plaintiff brings this nationwide class action pursuant to 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, individually and on behalf of a class defined as all persons in the United States who purchased the Product (the "Class").  Excluded from the Class are persons who made such purchases for purposes of resale.

58.      Plaintiff also seeks to represent a subclass of all Class Members who purchased the Product in the State of California (the "California Subclass").  Excluded from the California Subclass are persons who made such purchases for purpose of resale.

59.      As a result of additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

60.      At this time, Plaintiff does not know the exact number of members of the aforementioned Class and Subclasses ("Class Members" or "Subclass Members").  However, given the nature of the claims and the number of retail stores in the United States selling Defendant's

Product, Plaintiff believes that Class and Subclass Members are so numerous that joinder of all members is impracticable.

61.     There is a well-defined community of interest in the questions of law and facts involved in this case.  Questions of law and facts common to members of the Class predominate over questions that may affect individual Class Members include:

(a)     whether Defendant misrepresented and/or failed to disclose material facts concerning the Products;

(b)     whether Defendant's conduct was unfair and/or deceptive;

(c)     whether Defendant has been unjustly enriched as a result of the unlawful conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon it by Plaintiff and the Class;

(d)     whether Plaintiff and the Class sustained damages with respect to the common law claims asserted, and if so, the proper measure for their damages.

62.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated the California Consumers Legal Remedies Act as well as the California Unfair Competition Law.

63.     Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, purchased, in a typical consumer setting, Defendant's Product, and Plaintiff sustained damages from Defendant's wrongful conduct.

64.     Plaintiff is an adequate representative of the Class and Subclass because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

65.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members.  Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation

necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of liability issues.

## COUNT I
### (Violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)

66.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

67.     Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendant.

68.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act or practice."  For the reasons discussed above, Defendant has engaged in unlawful, unfair, and fraudulent business acts or practices in violation of California Business & Professions Code § 17200.

69.     By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210, as to the California Subclass, by engaging in unlawful, fraudulent, and unfair conduct.

70.     Defendant has violated the UCL's proscription against engaging in **Unlawful Business Practices** as a result of its violations of the CLRA, Cal. Civ. Code § 1770(a)(5), (a)(7), and (a)(9) as alleged below, violations of California's Song-Beverly Act, and violations of California's False Advertising Law, in addition to breaches of warranty and violations of common law.

71.     As more fully described above, Defendant's misleading marketing, advertising, packaging, and labeling of the Products is likely to deceive reasonable consumers.  In addition, Defendant has committed unlawful business practices by, inter alia, making the representations and

1   omissions of material facts, as set forth more fully herein, and violating the common law.

2         72.    Plaintiff and members of the California Subclass reserve the right to allege other

3   violations of law which constitute other unlawful business acts or practices.

4         73.    Defendant has also violated the UCL's proscription against engaging in **<u>Unfair</u>**

5   **<u>Business Practices</u>**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures

6   as alleged herein also constitute "unfair" business acts and practices within the meaning of Business

7   & Professions Code § 17200 *et seq*. in that its conduct is substantially injurious to consumers, offends

8   public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct

9   outweighs any alleged benefits attributable to such conduct.

10        74.    There were reasonably available alternatives to further Defendant's legitimate

11   business interests, other than the conduct described herein.

12        75.    Defendant has further violated the UCL's proscription against engaging in

13   **<u>Fraudulent Business Practices</u>**.  Defendant's claims, nondisclosures and misleading statements

14   with respect to the Products, as more fully set forth above, were false, misleading and/or likely to

15   deceive the consuming public within the meaning of Business & Professions Code § 17200.

16        76.    Plaintiff and the other California Subclass Members suffered a substantial injury by

17   virtue of buying the Products that they would not have purchased absent Defendant's unlawful,

18   fraudulent, and unfair marketing, advertising, packaging, and omission about the defective nature of

19   the Products.

20        77.    There is no benefit to consumers or competition from deceptively marketing and

21   omitting material facts about the true nature of the Products.

22        78.    Plaintiff and the other California Subclass Members had no way of reasonably

23   knowing that the Products they purchased were not as marketed, advertised, packaged, or labeled.

24   Thus, they could not have reasonably avoided the injury each of them suffered.

25        79.    The gravity of the consequences of Defendant's conduct as described outweighs any

26   justification, motive, or reason therefore, particularly considering the available legal alternatives

27   which exist in the marketplace, and such conduct is immoral, unethical, unscrupulous, offends

28

---

established public policy, or is substantially injurious to Plaintiff and the other California Subclass Members.

80.     Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass seek an order of this Court that includes, but is not limited to, an order requiring Defendant to (a) provide restitution to Plaintiff and the other California Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's and the California Subclass' attorneys' fees and costs.

## COUNT II
### (Violation of California's Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*)

81.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

82.     Plaintiff brings this claim individually and on behalf of the members of the proposed California Subclass against Defendant.

83.     Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

84.     Civil § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

85.     Civil § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

86.     Defendant violated Civil Code § 1770(a)(5), (a)(7), and (a)(9) by holding out the Product as safe, when in fact the Products are not safe, dangerous, and useless.

87.     The Products are not safe because they contain an extraordinary level of PFAS that subject unsuspecting consumers to significant health risks.

88.     Defendant has exclusive knowledge of the Product's composition, which was not known to Plaintiff or California Subclass Members.

89.     Defendant made partial representations to Plaintiff and California Subclass Members,

while suppressing the true nature of the Product.  Specifically, by displaying the Products and describing the Products as safe, including on the product packaging, on its website, and in its marketing, without disclosing that the Products were unsafe and detrimental to human health.  As described above, Defendant was in receipt of knowledge pertaining to PFAS in its Product and yet for a period of several years has continued to Product.  Moreover, Defendant affirmatively misrepresented the Products despite its knowledge that the Products were not as advertised.

90.     Plaintiff and the California Subclass Members have suffered harm as a result of these violations of the CLRA because they have incurred charges and/or paid monies for the Product that they otherwise would not have incurred or paid, and were unknowingly exposed to a significant and substantial health risk.

91.     On January 27, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a CLRA notice letter, which complies in all respects with California Civil Code § 1782(a).  The letter was sent via certified mail, return receipt requested, advising Defendant that they were in violation of the CLRA and demanding that they cease and desist from such violations and make full restitution by refunding the monies received therefrom.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant responded to the letter on February 15, 2022, refusing to make any changes to the Product, or to pull the Product from the marketplace.

92.     Accordingly, Plaintiff and the California Subclass Members seek all relief available under the CLRA, including restitution, the payment of costs and attorneys' fees, and any other relief deemed appropriate and proper by the Court.

## **COUNT III**
### **(Breach of Implied Warranty Under the Song-Beverly Act, Cal. Civ. Code § 1790, *et seq*. and California Commercial Code § 2314)**

93.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

94.     Plaintiff brings this claim individually and on behalf of all members of the California Subclasses.

95.     Under the Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790. *et seq.*, and California Commercial Code § 2314, every sale of consumer goods in the State of California is

accompanied by both a manufacturer's and retailer seller's implied warranty that the goods are merchantable, as defined in that Act.  In addition, every sale of consumer goods in California is accompanied by both a manufacturer's and retail seller's implied warranty of fitness when the manufacturer or retailer has reason to know that the goods as represented have a particular purpose and that the buyer is relying on the manufacturer's or retailer's skill or judgment to furnish suitable goods consistent with that represented purpose.

96.     California has codified the third-party beneficiary exception to any privity requirement.  Therefore, while ordinarily, Plaintiff might ordinarily be required to demonstrate vertical privity, he need not do so where, as here, he is a third-party beneficiary of Defendant's contracts with wholesalers or retail sellers and relied on Defendant's packaging in making his purchase.  Plaintiff and members of the California Subclass are third-party beneficiaries because the Product passed into commerce with warranties that were designed for the benefit of the end-user and not for the benefit of a wholesaler or retailer.

97.     The Product at issue here are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

98.     Plaintiff and the Class Members who purchased the Product are "retail buyers" within the meaning of Cal. Civ. Code § 1791.

99.     Defendant is in the business of manufacturing, assembling, and/or producing the Product and/or selling the Product to retail buyers, and therefore are a "manufacturer" and "seller" within the meaning of Cal. Civ. Code § 1791.

100.    Defendant impliedly warranted to retailer buyers that the Products were merchantable in that they would: (a) pass without objection in the trade or industry under the contract description, and (b) were fit for the ordinary purposes for which the Products are used.  For a consumer good to be "merchantable" under the Act, it must satisfy both of these elements.  Defendant breached these implied warranties because the Products were unsafe for use.  Therefore, the Product would not pass without objection in the trade or industry and were not fit for the ordinary purpose for which they are used.

101.    Plaintiff and California Subclass Members purchased the Product in reliance upon Defendant's skill and judgment in properly packaging and labeling the Product.

102.    The Product was not altered by Plaintiff or the California Subclass Members.

103.    The Product was defective at the time of sale when they it the exclusive control of Defendant.  The issue as described in this complaint was latent in the product and not discoverable at the time of sale.

104.    Defendant knew that the Product would be purchased and used without additional testing by Plaintiff and Class Members.

105.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and Class Members have been injured and harmed because they would not have purchased the Product if they knew the truth about the Product, namely, that they were unfit for use and posed a significant safety risk.

106.    Plaintiff and the California Subclass seek compensatory damages, attorney's fees, costs, and any other just and proper relief available under law.

## COUNT IV
**(Violation of California's False Advertising Law,
Cal. Bus. & Prof. Code § 17500, *et seq*.)**

107.    Plaintiff individually and on behalf of the California Subclass incorporate by this reference all allegations contained in the preceding paragraphs as if fully set forth herein.

108.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive class members and the public.  As described above, and throughout this Complaint, Defendant misrepresented the Product as "Safe For Use" when, in fact, the Product was not safe for use.

109.    By its actions, Defendant disseminated uniform advertising regarding the Product to and across California.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public for the reasons detailed herein.

110.    The above-described false, misleading, and deceptive advertising Defendant

disseminated continues to have a likelihood to deceive in that Defendant failed to disclose that the Product contains substances that pose a significant risk to the health and wellbeing of Plaintiff and the Subclass Members.

111.    Defendant continued to misrepresent to consumers that the Product was safe. However, as described, this is not the case.

112.    In making and disseminating these statements, Defendant knew, or should have known, its advertisements were untrue and misleading in violation of California law.  Plaintiff and other class members based their purchasing decisions on Defendant's omitted material facts.  The revenue attributable to the Products sold in those false and misleading advertisements likely amounts to tens of millions of dollars.  Plaintiff and Class members were injured in fact and lost money and property as a result.

113.    The misrepresentations and non-disclosures by Defendant of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitutes a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

114.    As a result of Defendant's wrongful conduct, Plaintiff and the class members lost money in an amount to be proven at trial.  Plaintiff and the class members are therefore entitled to restitution as appropriate for this cause of action.

115.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

## COUNT V
### (Fraud)

116.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

117.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

118.   At the time Plaintiff and Class members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as "Safe For Use."

119.   Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use.

120.   Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon Defendant's representations (and corresponding omissions) in making purchasing decisions.

121.   Plaintiff and Class members did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

122.   Plaintiff and Class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

123.   Plaintiff and Class members had a right to reply upon Defendant's representations (and corresponding omissions) as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

124.   Plaintiff and Class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiff and Class members to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

## COUNT VI
### (Constructive Fraud)

125.   Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

126.   Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

127.   At the time Plaintiff and Class members purchased the Product, Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

128.   Defendant affirmatively misrepresented the Product, giving the Product the appearance of a product that is indeed safe for use.

129.     Defendant also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely upon its representations (and corresponding omissions) in making purchasing decisions.

130.     Defendant had an obligation not to omit or misrepresent the Product because in addition to the fact that the Product pertained to matters of safety: (a) it was in the sole possession of such information; (b) it made partial representations regarding the quality of the Product; (c) Plaintiff and class members relied upon Defendant to make full disclosures based upon the relationship between Plaintiff and class members, who relied on Defendant's representations and omissions, and were reasonable in doing so, with the full knowledge of Defendant that it did and would have been reasonable in doing so.

131.     Plaintiff and Class and Subclass members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

132.     Plaintiff and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

133.     Plaintiff and class members had a right to rely upon Defendant's representations (and corresponding omissions) as, in addition to the fact that the issue pertained to safety, Defendant maintained monopolistic control over knowledge of the true quality of the Product, and what information was available regarding the Product.

134.     Defendant breached its duty to Plaintiff and class members to make full disclosures of the safety of its Product.

135.     Plaintiff and class members sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, and Defendant's breach of its duty, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

## <u>COUNT VII</u>
### (Fraudulent Inducement)

136.     Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

137.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

138.    Defendant did not disclose, but instead concealed and misrepresented, the Product as discussed herein.

139.    Defendant knew, or should have known, that the Products were falsely portrayed and that knowledge of the safety-related issues discussed throughout was withheld from the consumer public.

140.    Defendant also knew that its omissions and misrepresentations regarding the Product was material, and that a reasonable consumer would rely on Defendant's representations (and corresponding omissions) in making purchasing decision.

141.    Plaintiff and Class members did not know—nor could they have known through reasonable diligence—about the true quality of the Product.

142.    Plaintiff and class members would have been reasonable in relying on Defendant's misrepresentations (and corresponding omissions) in making their purchasing decisions.

143.    Plaintiff and class members had a right to rely on Defendant's representations (and corresponding omissions) as Defendant maintained a monopolistic control over the Product, and what information was available regarding the Product.

144.    Defendant intended to induce—and did, indeed, induce—Plaintiff and class members into purchasing the Product based upon their affirmative representations and omissions.

145.    Plaintiff and class members sustained damages as a result of their reliance on Defendant's omission and misrepresentations, thus causing Plaintiff and class members to sustain actual losses and damages in a sum to be determined at trial.

## COUNT VIII
### (Money Had and Received)

146.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

147.    Plaintiff brings this claim individually and on behalf of the Class under the laws of

the State of California.

148.    As a result of the Plaintiff's and Class Members' purchase of the Product, Defendant obtained money for its own use and benefit, and, as a result of its breaches of contract and breaches of the covenant of good faith and fair dealing implied in those agreements, became indebted to the Plaintiff and class members in an amount to be determined at trial.

149.    No part of any of the monies due and owing to Plaintiff and class members has been repaid, although Plaintiff and class members demand repayment, leaving the balance due, owing, and unpaid in an amount to be determined at trial plus interest.

<u>**COUNT IX**</u>
**(Fraudulent Concealment or Omission)**

150.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

151.    Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

152.    At all relevant times, Defendant was engaged in the business of designing, manufacturing, distributing, and selling the Product.

153.    Defendant, acting through its representatives or agents, delivered the Product to its own distributors and various other distribution channels.

154.    Defendant willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Product as discussed throughout.

155.    Rather than inform consumers of the truth regarding the Product, Defendant misrepresented the quality of the Product as discussed herein at the time of purchase.

156.    Defendant made these material misrepresentations to boost or maintain sales of the Product, and in order to falsely assure purchasers of the Product that Defendant is a reputable company and that its Product is safe for use.  The false representations were material to consumers because the representations played a significant role in the value of the Product purchased.

157.    Plaintiff and class members accepted the terms of use, which were silent on the true

nature of the Product, as discussed throughout.  Plaintiff and class members had no way of knowing that Defendant's misrepresentations as to the Product, and had no way of knowing that Defendant's misrepresentations were misleading.

158.    Although Defendant had a duty to ensure the accuracy of the information regarding the Product, it did not fulfill these duties.

159.    Defendant misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Product were essential for its continued growth and to maintain and grow their reputation as a premier designer and vendor of the Product.  Such benefits came at the expense of Plaintiff and Class Members.

160.    Plaintiff and Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiff's and class member's actions were justified given Defendant's misrepresentations.  Defendant was in the exclusive control of material facts, and such facts were not known to the public.

161.    Due to Defendant's misrepresentations, Plaintiff and Class Members sustained injury due to the purchase of the Product that did not live up to their advertised representations.  Plaintiff and class members are entitled to recover full refunds for the Product they purchased due to Defendant's misrepresentations.

162.    Defendant's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiff, and Class Members' rights and well-being, and in part to enrich itself at the expense of consumers.  Defendant's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competing products.  Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## COUNT X
### (Fraudulent Misrepresentation)

163.    Plaintiff incorporates by this reference the allegations contained in the preceding paragraphs as if fully set forth herein.

164.     Plaintiff brings this claim individually and on behalf of the Class under the laws of the State of California.

165.     Defendant falsely represented to Plaintiff and the Class that the Product was Safe For Use.

166.     Defendant intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Class to purchase the Product.

167.     Defendant knew or should have known that their representations about the Product were false in that the Product is not safe for use as discussed throughout.  Defendant knowingly allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Class.

168.     Plaintiff and the Class did in fact rely on these misrepresentations and purchased the Product to their detriment.  Given the deceptive manner in which Defendant advertised, marketed, represented, and otherwise promoted the Product, Plaintiff's and the Class' reliance on Defendant's misrepresentations was justifiable.

169.     As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known of the safety risks associated with the Product and that it does not conform to the Product's labels, packaging, advertising, and statements.

170.     Plaintiff and the Class seek actual damages, attorney's fees, costs, and other such relief the Court deems proper.

### COUNT XI
### (Negligent Misrepresentation)

171.     Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

172.     Plaintiff brings this claim individually on behalf of the Class under the laws of the State of California.

173.   Defendant had a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the developing, testing, manufacture, marketing, detailing, distribution, and sale of the Product.

174.   Defendant breached their duty to Plaintiff and the Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiff and the Class that did not have the qualities, characteristics, and suitability for use as advertised by Defendant and by failing to promptly remove the Product from the marketplace or take other appropriate remedial action.

175.   Defendant knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for their intended use and were otherwise not as warranted and represented by Defendant.   Specifically, Defendant knew or should have known that the Product was not safe for use.

176.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they would not have purchased the Product at all had they known that the Product was not safe for use and that the Product does not conform to the Product's labeling, packaging, advertising, and statements.

177.   Plaintiff and the Class seek actual damages, attorney's fees, costs, and any other just and proper relief available.

## COUNT XII
### (Quasi-Contract / Unjust Enrichment)

178.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

179.   Plaintiff brings this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

180.   To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

181.   Plaintiff and Class Members conferred benefits on Defendant by purchasing the Product.

182.    Defendant was unjustly enriched in retaining the revenues derived from Plaintiff and Class Members' purchases of the Product.  Retention of those moneys under these circumstances is unjust and inequitable because Defendant failed to disclose that the Product was unfit for their intended purpose as it was unsafe for use.  These omissions caused injuries to Plaintiff and Class Members because they would not have purchased the Product if the true facts were known.

183.    Because Defendant's retention of the non-gratuitous benefits conferred on them by Plaintiff and Class Members is unjust and inequitable, Defendant has been unjustly enriched in an amount to be determined at trial.

## COUNT XIII
### (Breach of Express Warranty)

184.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

185.    Plaintiff brings this claim individually and on behalf of Members of the Nationwide Class under the laws of the State of California.

186.    Plaintiff and Class Members formed a contract with Defendant at the time Plaintiff and Class Members purchased the Product.

187.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Product packaging and through marketing and advertising, as described above.

188.    This labeling, marketing, and advertising constitute express warranties and became part of the basis of the bargain and are part of the standardized contract between Plaintiff and Class Members.

189.    As set forth above, Defendant purports through their advertising, labeling, marketing, and packaging, to create an express warranty that the Product is safe for its intended use.

190.    Plaintiff and Class Members performed all conditions precedent to Defendant's liability under this contract when they purchased the Product.

191.    Defendant breached express warranties about the Product and their qualities because despite Defendant's warranties that the Product is "Safe For Use," the Product is not in fact safe for use.  Thus, the Product did not confirm to Defendant's affirmations and promises described above.

192.   Plaintiff and each Class Member would not have purchased the Product had they known the true nature of the Product.

193.   In accordance with UCC § 2-607, Plaintiff provided written notice to Defendant of its breach of warranty via Certified Mail, Return Receipt Requested, on January 27, 2022.  Plaintiff's letter notified Defendant of its breaches of warranty and breaches of California consumer protection laws.  Defendant has refused to redress the breaches identified in Plaintiff's letter.

194.   As a result of Defendant's breach of warranty, Plaintiff and each Class Member suffered and continues to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorney's fees, as allowed by law.

### COUNT XIV
**(Violation Of The Magnuson-Moss Warranty Act,**
**15 U.S.C. §§ 2301, *et seq.*)**

195.   Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

196.   Plaintiff brings this claim individually and on behalf of the members of the Class under the laws of the State of California.

197.   The Product is a consumer product as defined in 15 U.S.C. § 2301(1).

198.   Plaintiff and Class Members are consumers as defined in 15 U.S.C. § 2301(3).

199.   Defendant is a supplier and warrantor as defined in 15 U.S.C § 2301(4) and (5).

200.   In connection with the marketing and sale of the Product, Defendant impliedly warranted that the Product was fit for use and expressly warranted that the Product was "Safe For Use."  However, as described throughout, neither is true.

201.   By reason of Defendant's breach of warranties, Defendant violated the statutory rights due to Plaintiff and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C §§ 2301, *et seq.*, thereby damaging Plaintiff and the Class.

202.   On January 27, 2022, prior to the filing of this Complaint, Plaintiff's counsel sent Defendant a pre-suit notice letter, apprising Defendant of its breach of warranties.  The letter was sent via certified mail, return receipt requested.  The letter stated that it was sent on behalf of all other similarly situated purchasers.  Defendant responded to the letter on February 15, 2022, refusing to

make any changes to the Product, or to pull the Product from the marketplace.

203.    Plaintiff and the Class Members were injured as a direct and proximate result of Defendant's breach because they would not have purchased the Product if they knew the truth about the Product.

## COUNT XV
### (Negligent Failure to Warn)

204.    Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

205.    Plaintiff brings this claim individually and on behalf of members of the Class under the laws of the State of California.

206.    At all relevant times, Defendant was responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Product. At all relevant times, it was reasonably foreseeable by Defendant that the use of the Product in its intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Product.

207.    At all relevant times, Defendant knew or had reason to know of the risk of injury and the resultant harm that the Product posed to Plaintiff and Class Members, as the Defect existed at the time of its design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

208.    Defendant as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Product, had a duty to warn Plaintiff and the Class of all dangers associated with the intended use of the Product.

209.    At minimum, the duty arose for Defendant to warn consumers that use of the Product could result in injury and was unreasonably dangerous.

210.    Defendant was negligent and breached its duty of care by negligently failing to provide warnings to purchasers and users of the Product, including Plaintiff and the Class, regarding the true nature of the Product, its risks, and potential dangers.

211.    Defendant was negligent and breached its duty of care by concealing the risks of and failing to warn consumers that the Product contains ingredients known to cause adverse health effects in humans.

212.    Defendant knew, or through the exercise of reasonable care, should have known of the inherent Defect and resulting dangers associated with using the Product as described herein, and knew that Plaintiff and Class Members could not reasonably be aware of those risks.  Defendant failed to exercise reasonable care in providing Plaintiff and the Class with adequate warnings.

213.    As a direct and proximate result of Defendant's failure to adequately warn consumers that the use of the Product, including its intended use, could cause and has caused injuries and other damages, Plaintiff and the Class have suffered damages, as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

A.    For an order certifying the Class under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Class and the Subclass and Plaintiff's attorneys as Class Counsel;

B.    For an order declaring the Defendants' conduct violates the statutes referenced herein;

C.    For an order finding in favor of Plaintiff, the nationwide Class, and the California Subclass on all counts asserted herein;

D.    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

E.    For prejudgment interest on all amounts awarded;

F.    For an order of restitution and all other forms of equitable monetary relief;

G.    For injunctive relief as pleaded or as the Court may deem proper; and

H.    For an order awarding Plaintiff and the Class and California Subclass their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  March 28, 2022                  Respectfully submitted,

                                        **BURSOR & FISHER, P.A.**

                                        By:  ___/s/ Sean L. Litteral___
                                                Sean L. Litteral

                                        Sean L. Litteral (State Bar No. 331985)
                                        1990 North California Blvd., Suite 940
                                        Walnut Creek, CA 94596
                                        Telephone: (925) 300-4455
                                        Facsimile: (925) 407-2700
                                        E-Mail: slitteral@bursor.com

                                        **BURSOR & FISHER, P.A.**
                                        Joshua D. Arisohn (*pro hac vice* forthcoming)
                                        Alec M. Leslie (*pro hac vice* forthcoming)
                                        888 Seventh Avenue
                                        New York, NY 10019
                                        Telephone: (212) 837-7150
                                        Facsimile:  (212) 989-9163
                                        Email: jarisohn@bursor.com
                                                aleslie@bursor.com

                                        *Attorneys for Plaintiff*

**<u>CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)</u>**

I, Sean L. Litteral, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am an associate at Bursor & Fisher, P.A., counsel of record for Plaintiff Mahmood Dawood.  Plaintiff Dawood resides in Lodi, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Eastern District of California, as Plaintiff purchased the Product from a brick-and-mortar retail stores located within this District.   Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Products at issue to Plaintiff from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Walnut Creek, California this 28th day of March, 2022.


  <u>/s/ Sean L. Litteral</u>
  Sean L. Litteral

CLRA DECLARATION